WESTINGHOUSE ELECTRIC & MFG. CO. v. CUTTER ELECTRIC & MFG. CO.

(Circuit Court of Appeals, Third Circuit. April 12, 1909.)

No. 55.

1. PATENTS (§ 328*) — VALIDITY AND INFRINGEMENT — AUTOMATIC CIRCUIT BREAKER.

The Wright and Aalborg patent No. 633,772, for an automatic circuit breaker, claims 2 and 5, were not anticipated and disclose patentable invention, the device being a distinct advance on the prior art. Also *held* infringed by devices operating on the same principle and different only in the substitution of equivalent parts.

[Ed. Note.—For other cases, see Patents, Dec. Dig. § 328.*]

2. PATENTS (§ 22*)—INFRINGEMENT—SUBSTITUTION OF EQUIVALENT PARTS.

The substitution of a cam for a patented toggle joint in a patented mechanical combination does not avoid infringement, where the two have the same purpose in the combination and effect it in substantially the same manner.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 24; Dec. Dig. § 22.*]

Appeal from the Circuit Court of the United States for the Eastern District of Pennsylvania.

See, also, 149 Fed. 437.

Thomas B. Kerr and Thomas W. Bakewell, for appellant.

Joseph C. Fraley, for appellee.

Kerr, Page & Cooper (Thomas W. Bakewell, Thomas B. Kerr, and John C. Kerr, of counsel), for complainant.

Fraley & Paul (Jos. C. Fraley, of counsel), for defendant.

Before BUFFINGTON, Circuit Judge, and ARCHBALD, District Judge.

BUFFINGTON, Circuit Judge. In the court below, the Westinghouse Electric & Manufacturing Company, owner of patent No. 633,-772, granted September 26, 1899, to Wright and Aalborg, for an automatic circuit breaker, filed a bill against the Cutter Electric & Manufacturing Company charging infringement of the second and fifth claims thereof. The court below, on an application for a preliminiary injunction (149 Fed. 437), refused such injunction and subsequently on final hearing dismissed the bill, whereupon the complainant appealed

to this court from such decree. The claims here in question were held valid by this court in an opinion reported at 143 Fed. 966, 75 C. C. A. 152, and by the Circuit Court of Appeals for the Second Circuit in an opinion reported in Westinghouse Electric & Mfg. Co. v. Condit Electric Co., 167 Fed. 546, subsequent to the argument of the present case.

In carrying heavy electric currents for lighting and power, it is necessary to use switches for opening and closing circuits. These are protected against the abnormal currents caused by lighting or overloading by automatic circuit breakers. The main contacts of the circuit breakers are copper, which is highly conductive and relatively expensive. Their surfaces must be kept smooth and unpitted, otherwise dangerous and destructive arcs will form. Moreover, when an electric circuit is opened or interrupted, an arc forms between the contact surfaces owing to the current continuing for an instant between unconnected contacts, and if the current is large the damage both to the contacts and the surrounding apparatus may be great. To obviate that difficulty a supplementary or shunt current having carbon contacts is resorted to around terminals. These carbons are cheaper, and, being refractory, are less liable to injury from the arc. Such shunt contacts are arranged to open after and close before the main contacts, so that when the circuit is opened the current flows last through the shunt terminals, and the first contact is also between such carbon terminals when it is closed. These general principles were present in various constructions prior to the patent in question. The patentees, however, embodied the principle in a device which not only made these successive contacts by a novel form of connecting apparatus, but they so vertically aligned the parts of the apparatus as to produce a new type of long, narrow circuit breaker styled "Edgewise." This edgewise type developed several important advantages. To combine safety with great carrying capacity and yet secure economy of space, it is important that the apparatus should not be spread laterally, but that the different parts of a circuit breaker should be so located with reference to each other, and the circuit breaker itself to other circuit breakers, that currents should not stray to other instruments or parts of the same instrument, and arcs should be minimized and instantly extinguished without contact with other apparatus. These requirements were met by the patentees' device. The breaker is long, narrow, and all parts vertically aligned. It opens outwardly from the switchboard, and carries all working parts away from adjoining instruments. The arm is hinged at the bottom, and the shunt contacts, being above the copper ones, pass over longer arcs. These main contacts are laminated, being composed of a number of springy, metallic, bevel-edged plates. When forced against the flat surface of the main stationary contact, they make a maximum metallic conductive surface and utilize the entire conductive cross-section. The whole mechanism is adapted to ease and rapidity in closing. These and other advantages led this court in the opinion cited to hold that the invention "was a distinct advance upon the prior art, producing new and valuable results."

In the present suit the respondent has adduced testimony, not before the court in the prior one, in the patent of Herrick No. 504,528, two English patents and a prior use. In view of the fact that it is conceded that all the elements of the patent in suit are old, these several citations, which simply show that some of the elements of the patent in suit were old, but do not show all of the elements of the claims in combination, do not avail to defeat the patent. Together with the testimony relating to type B of complainant's device, they have been considered, but we see no reason to depart from the court's former holding that the patent is valid.

This leaves us to consider the question of infringement which is predicated on Exhibits 3 and 4, illustrated in the accompanying cuts:

*No 3*

No. 4

Complainant's breaker is illustrated in the cut following:

FIG. 1.

The difference between the device of complainant and those of respondent falls within a narrow compass. Both complainant's device and respondent's No. 3 agree in having the stationary shunt carbon yieldingly pivoted, but in complainant's device the movable shunt carbon is mounted on a spring pivot, while in respondent's it is mounted on a spring arm on the one side, and a spring pivot on the other side of the device. Now, we are clear the two methods are practically the same. The functional parts in each are: First, a pivot to permit motion; and, secondly, a spring to compel motion. In the case of a spring arm the yielding point which corresponds to the play of a pivot is placed at one end of the arm, and the arm itself is made resilient. In the other, the movable member is pivoted in the center, and a spring is so located that both ends of the member move from the pivot center. In a general way, a pivoted spring arm may be described as half of a centrally-pivoted, spring-equipped member. It is evident, therefore, that this mere change of form was not a change in substance, and both devices have a pivotal carbon-movement relation to the copper-contact member, and fall within the general description of claim 2, viz., "a movable shunt-contact member pivoted to said laminated contact member," and of claim 5, viz., "a shunt-contact member pivoted to said main member at a distance from its axis of movement." In respondent's No. 4 device, the shunt carbon 13 on the switchboard side of the breaker is yieldingly held forward so that its upper end is thrust outward toward the movable, shunt carbon, 15. Thereby the two carbons make an edge contact when the breaker is closed. The carbon, 13, then turns on the pivot, 16, so as to bring its face in full contact with the movable shunt carbon. The two carbons thus joined, owing to the spring in the arm supporting carbon, 13, jointly yield as the entire arm is pressed in, and thus permit the closing of the laminated member, 4, against the main stationary terminals. The fact that respondent pivots its carbon on the rear side of the mechanism is not material. It is a mere mechanical transfer of the functional action to another alternative point; in fact, an obvious transfer of position with retention of functional identity. There was a double pivoting in the original case, and of it the court said:

"That the complainant pivots only one of its carbons, while the defendant pivots both of them, is an immaterial difference. Either one or both may be pivoted to secure the desired yielding and turning motion."

Nor does the fact that respondent actuates the breaker by a cam instead of a toggle joint avail to relieve it from infringement. Abstractly, a cam may have broader capabilities than a toggle joint. But those broader capabilities are not functionally needed by the respondent. It simply employs those capabilities which the cam possesses in common with the toggle joint to accomplish in its machine what the toggle joint did in that of the patentees. Its substitution is manifestly not to accomplish any other or different result from that effected by the toggle joint, but merely to avoid its duplication. Without, therefore, saying that in all cases the two mechanisms are equivalent, yet having the same purpose in combination, and effecting that purpose in sub-

stantially the same manner, they are, as to the combination here involved, equivalents of each other.

We are therefore of opinion that infringement has been established, and a decree so adjudging will be entered in the court below.